NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0542n.06
Filed: August 1, 2006

No. 05-1125

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| PAUL JOHN SAKE, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant.* | ) | |

BEFORE:     MOORE, COLE and CLAY, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.** Paul John Sake pleaded guilty to conspiring to possess with intent to distribute 3, 4-methylenedioxy methamphetamine ("MDMA"), a schedule I- controlled substance commonly referred to as "Ecstacy," in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. Sake now challenges his sentence of 120 months' imprisonment on a variety of bases. For the reasons that follow, we **AFFIRM** Sake's sentence.

**I.**

Paul John Sake was indicted in the United States District Court for the Western District of Michigan on August 12, 2003, along with Jason Valdez and Adam Williams, on one count of conspiracy to possess with intent to distribute Ecstacy. Each defendant pleaded guilty to the sole count of the indictment. A third co-conspirator, Ezra Salmon, who was not indicted in federal court, pleaded guilty in state court to possession of Ecstasy with intent to deliver.

Valdez, Williams, and Salmon agreed to cooperate with the government, and Valdez and Williams stipulated by plea to a specific amount of relevant conduct. Valdez pleaded guilty to conspiring to possess with intent to distribute a quantity of 18,000 pills of Ecstacy and Williams to a quantity of 14,000 pills. Valdez and Williams were sentenced to 60 and 37 months' imprisonment, respectively, in federal court. Salmon was sentenced in state court to twelve months' imprisonment.

In contrast to his co-conspirators, Sake contested the relevant conduct that was attributed to him. The Presentence Investigation Report ("PSR") recommended that 18,600 pills of Ecstacy and 1.5 gallons of human growth hormone ("GHB") be attributed to Sake on the basis of the proffers of his co-conspirators and the statements of investigating officers. Sake denied responsibility for any more than 5,500 pills, and denied having sold any GHB. As a result, the district court conducted a three-day sentencing hearing, at which Valdez, Williams, and Salmon, among others, testified on behalf of the government. At the conclusion of this hearing, the district court found, by a preponderance of the evidence, that the PSR estimate was accurate: Sake was responsible for at least 18,000 pills of methamphetamine and 1.5 gallons of GHB.

The PSR also recommended that Sake not be granted a reduction of his offense level for acceptance of responsibility. Furthermore, on the basis of testimony from one of Sake's fellow county jail inmates, the PSR recommended a two-point increase in Sake's offense level for obstruction of justice. The inmate, Tim Haithcox, stated that Sake asked him whether he would "set up" Salmon, who had cooperated with the government, by planting drugs at Salmon's residence. Furthermore, Haithcox claimed that Sake offered him $1,500 to "rub out" Salmon, while making a pistol motion to his head. Finally, Sake allegedly asked Haithcox if the district judge was likely

to take a bribe.  The PSR ultimately calculated Sake's total offense level at 32, with a criminal history category of III.

The district court declined to credit Haithcox's allegations and therefore rejected the PSR's obstruction- of-justice recommendation.  The district court asked the prosecutor whether she thought Sake should get a reduction for acceptance of responsibility.  The prosecutor recommended a two-point reduction, but opined that Sake had not lived up to his obligation to accept responsibility in that he had, *inter alia*, contested the relevant conduct attributable to him.  The district court reduced Sake's offense level by two for acceptance of responsibility.

Sake also requested a downward departure due to poor mental health.  In support of this request, Sake introduced the testimony of Dr. William Brooks, a psychologist, who opined that Sake suffered from bipolar and "major depressive" disorder.  The government relied on the testimony of Dr. Jill Grant, a forensic psychologist employed by the Federal Bureau of Prisons, who testified that Sake suffered from cyclothymia, a disorder similar to bipolar disorder but more common and less severe.  The district court credited the testimony of Grant over that of  Smith, and found that Sake's mental health problems could be treated adequately in a prison facility, and declined to depart downward.

Ultimately, the district court calculated a total offense level of 28, which, given Sake's uncontested criminal history category of III, yielded a recommended sentencing range of 97 to 121 months.  Acknowledging the advisory nature of the Guidelines under *United States v. Booker*, 543 U.S. 220 (2005), issued only days earlier, the district court sentenced Sake to 120 months'

imprisonment with a recommendation that he receive treatment for drug addiction and mental health problems. This timely appeal followed.

## II.

## A.

Sake argues that any "unstipulated conduct" that would increase his sentence must be proven beyond a reasonable doubt. Therefore, according to Sake, he can only be attributed with the 5,000 and 5,500 pills that he admitted distributing. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that any fact that increased a defendant's sentence beyond the statutory maximum must be admitted or proven beyond a reasonable doubt. *Id.* at 490. Contrary to Sake's argument, however, "*Apprendi* does not apply to Guidelines determinations, only statutory maximums." *United States v. DeJohn*, 368 F.3d 533, 546 (6th Cir. 2004). The maximum sentence for conspiracy to distribute a schedule I substance is twice what Sake received, 21 U.S.C. § 841(b)(1)(D) (setting maximum sentence at 20 years), and thus the proscriptions of *Apprendi* have not been triggered.

Indeed, provided that it "err[s] on the side of caution," a district court is entitled to estimate uncertain drug quantities. *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1999); *United States v. Gardner*, 417 F.3d 541, 546 (6th Cir. 2005) (reaffirming *Walton* post-*Booker*). We review such an estimation for clear error, *id.* at 543, meaning that this Court will "ask whether on the entire evidence it is left with the definite and firm conviction that a mistake has been committed," *United States v. Orlando*, 363 F.3d 596, 603 (6th Cir. 2004) (internal citation omitted).

In this case, the district court conducted a three-day, thirteen-witness sentencing hearing. At that hearing, all three of Sake's co-conspirators, each of whom admitted to distributing thousands of pills themselves, testified that Sake was at the heart of the conspiracy. The court credited Salmon's testimony in particular because, in the words of the court, Salmon was "the most credible witness in this whole hearing." Consistent with the testimony of Sake's co-conspirators, 18,000 pills and 1.5 gallons of GHB is a conservative estimate. Additionally, another county jail inmate testified that Sake admitted to shipping between 18,000 and 20,000 pills of methamphetamine. Accordingly, Sake's first claim, related to the amount of relevant conduct attributed to him, must fail.

**B.**

Sake next argues that the district court erred in refusing to depart downward, pursuant to U.S.S.G. § 5H1.3 or "Chapter Five," on the basis that Sake suffered from bipolar disorder. This Court does not have jurisdiction to review a district court's conscious and express decision not to depart downward from the Guidelines where the judge understands that he has the authority to depart downward and does not consider unlawful reasons. *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002); *United States v. Butler*, 207 F.3d 839, 843 (6th Cir. 2000). *See also United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005) (reaffirming *Steward* post-*Booker*); *United States v. Jones*, 417 F.3d 547, 550 (6th Cir. 2005). *But see United States v. McBride*, 434 F.3d 470, 475 (6th Cir. 2006) (holding that the refusal to downward depart may be considered as a factor in reviewing a sentence for overall reasonableness). Therefore, Sake's second claim fails.

**C.**

Sake argues that the government breached Sake's plea agreement by failing to recommend an additional, one-level reduction for acceptance of responsibility. As an officer of the court, a prosecutor's error may under certain circumstances necessitate reversal of a conviction or sentence. *See United States v. Swanberg*, 370 F.3d 622, 629 (6th Cir. 2004). Nor would such an error be harmless in this case, since a one-level reduction would have changed Sake's recommended sentencing range to between 87 and 108 months. We review *de novo* an allegation that the government breached its plea agreement, *United States v. Barnes*, 278 F.3d 644, 646 (6th Cir. 2002), which is in essence a contract, *see Jones*, 417 F.3d at 549 n.1 (citing *Ricketts v. Adamson*, 483 U.S. 1, 10-12 (1987)).

According to Sake's plea agreement, "[s]hould the Court grant a two-level reduction . . . the government . . . will move the Court to grant an additional one[-]level reduction." The district court granted a two-level reduction, and hence Sake argues that the government should have moved for an additional reduction. Read in its entirety, however, the "Acceptance of Responsibility" clause to which Sake refers does not support the relief he requests. The clause reads (emphasis added):

> The United States agrees not to oppose the Defendant's request for a reduction of his offense level for acceptance of responsibility under § 3E1.1 of the United States Sentencing Guidelines *provided the Defendant satisfies the criteria for such a reduction.* Should the Court grant a two-level reduction *as provided herein*, the government certifies that the plea was provided sufficiently in advance of trial to allow the government to forego the expenses of trial preparation and will move the Court to grant an additional one[-]level reduction pursuant to U.S.S.G. § 3E1.1(b), as amended.

To "satisf[y] the criteria" for an acceptance of responsibility reduction under the Guidelines, a defendant must "clearly demonstrate[] acceptance of responsibility," U.S.S.G. § 3E1.1(a).

Meanwhile, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1. (comment 1(a)).[1]  In this case, Sake contested the relevant conduct attributable to him, and the district court determined that Sake's claim that he was only responsible for between 5,000 and 5,500 pills of methamphetamine was false.  Thus, Sake has acted in a manner inconsistent with acceptance of responsibility, as defined by the Sentencing Guidelines.

That the district court did ultimately decide to reduce Sake's sentence by two points does not change our analysis.  Following the Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005), a district court has the discretion to take the Guidelines under advisement, but ultimately discount them.  The court chose to do so in this case.  Sake's actions of falsely or frivolously denying relevant conduct absolved the government of its obligation, since the obligation was premised on Sake's satisfaction of the relevant criteria.

---

[1]U.S.S.G. 3E1.1, comment 1(a), reads in its entirety:

1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
(a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.

Moreover, it was only in the event that the district court awarded a reduction "as provided herein," i.e., based on the Guideline criteria, that the government was further obligated to move for an additional reduction. In recommending a two-level reduction, the government explicitly referred to its release from the acceptance clause at sentencing; government counsel recommended a two-level reduction, though it "need not do so under the terms of the plea agreement." It would be an odd result were the government absolved of its responsibility to recommend *any* reduction, but obligated to recommend an additional reduction should the court exercise its discretion in Sake's favor. Accordingly, Sake's third claim fails.

**D.**

Fourth, Sake argues that the district court's application of the Protect Act of 2003, Pub. L. No. 108-21, violates the *Ex Post Facto* Clause of the Constitution, U.S. Const. Art. I, § 9. An *ex post facto* violation occurs when a law is retroactively applied to a defendant to her disadvantage. *Weaver v. Graham*, 450 U.S. 24, 29 (1981). Ordinarily, this Court would review an *ex post facto* challenge *de novo*. *United States v. Richardson*, 437 F.3d 550, 555 (6th Cir. 2006); *United States v. Copeland*, 321 F.3d 582, 601 (6th Cir. 2003) ("This court reviews a constitutional challenge to a defendant's sentence de novo wherever the defendant preserves the claim for appellate review."). However, because Sake makes this argument for the first time on appeal, we instead review for plain error. *Id.*; *United States v. Hamm*, 400 F.3d 336, 339 (6th Cir. 2005). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse

impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."
*Id.* (internal citation omitted).

The district court did not expressly apply the Protect Act. In reducing Sake's sentence by two points for acceptance of responsibility, however, the court stated: "I think [Sake] is entitled to two points . . . and he's not entitled to three, because [the prosecutor] didn't move for three, that's what the guidelines require." The district court clearly refers to U.S.S.G. § 3E1.1(b), which, as amended by the Protect Act, requires that the government move for a third point of reduction. A least one circuit has held that where a defendant whose offense predates the passage of the Protect Act is only granted a two-point reduction under the Guidelines, that defendant has been subjected to an *ex post facto* law. *See United States v. Borer*, 412 F.3d 987, 990-91 (8th Cir. 2005).

If the court erred in applying the Protect Act, however, the error was neither obvious nor prejudicial to Sake's significant rights, nor adverse to the fairness, integrity, or reputation of the proceeding. Prior to amendment, and at the time of Sake's offense, the Guidelines provided that a defendant was entitled to a three-level reduction if he "timely notifie[d] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." *Id.* at 989-90 (quoting U.S.S.G. § 3E1.1(b)(2) (Nov. 1, 2002)). In this case, Sake disputed the relevant conduct, thereby forcing a costly hearing. The requirement that Sake "clearly demonstrate[] acceptance of responsibility" was included by amendment in 1992, a decade before Sake's offense. *See* U.S.S.G. § 3E1.1 (Historical Notes). Therefore, Sake cannot prevail on this claim.

**E.**

Sake next argues that the district court's *ex post facto* application of *United States v. Booker*, 543 U.S. 220, which had not been decided at the time of Sake's offense, violates the Due Process Clause. It is clear that *Booker* was meant to apply retroactively. *Booker*, 543 U.S. at 268 ("[W]e must apply today's holdings . . . to all cases on direct review."). We have held, however, that where a defendant was treated the same post-*Booker* as he would have been treated pre-*Booker*, *ex post facto* concerns are not implicated. *Richardson*, 437 F.3d at 555 (citing *Weaver v. Graham*, 450 U.S. 24, 29 (1981)). In this case, Sake was sentenced within a range calculated under the Guidelines. The district court determined Sake's relevant conduct in the same manner as it would pre-*Booker*. *Compare Walton*, 908 F.2d at 1302, *with Gardner*, 417 F.3d at 546. Thus, Sake's claim must fail.

**F.**

Finally, Sake argues that his sentence was unreasonable. Following *Booker*, we review a district court's sentence for reasonableness, subjecting findings of law to *de novo* review and findings of fact for clear error. *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005); *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005). Clear error occurs only when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993). A sentence that was properly calculated under the now-advisory Guidelines is presumptively reasonable, assuming that the district court discussed the factors outlined in 18 U.S.C. § 3553(a). *Webb*, 403 F.3d at 383; *see also Booker*, 543 U.S. at 764-65.

In this case, the district court identified its obligation to assess the § 3553(a) factors and proceeded to do so. For instance, the district court discussed the impact of Ecstasy on the community, and on Sake in particular. The court discussed an outstanding bench warrant for Sake's arrest in Orange County, California, his likelihood of re-offending, and the necessity of psychiatric treatment. In arguing that his sentence of 120 months was unreasonable, Sake essentially reiterates his earlier challenges. Sake argues that he was entitled to a lesser sentence due to an inflated assessment of relevant conduct and because he has mental health problems. Sake adds that his co-defendants received substantially lower sentences for similar conduct. Given the extensive testimony of Sake's co-conspirators concerning his role in the offense, the district court's finding of relevant conduct did not constitute clear error.

Nor did the district court commit clear error in crediting Dr. Grant's diagnosis over that of Dr. Brooks. Grant's diagnosis was premised on interviews with nursing correctional staff, Sake's family members, Sake, and Brooks. In contrast, Brooks acknowledged that his diagnosis was the result only of self-reporting and family history and his observations of Sake's daily prison activities. Brooks admitted that, in situations such as Sake's wherein a defendant seeks to gain a reduction in his sentence on the basis of mental health, a forensic evaluation is "very important." Moreover, he conceded that he was not trained as a forensic evaluator, and that forensic evaluation differs considerably from general evaluation.

Finally, as the district court also mentioned, the disparity in the sentences received by Sake's co-conspirators reflects a difference in their histories and behavior. Valdez and Williams, for example, only had a criminal history category of I, as opposed to Sake's criminal history category

of III.  Moreover, Valdez and Williams stipulated to relevant conduct, which Sake did not.

Accordingly, Sake's sixth and final claim fails.

### III.

For the reasons that precede, we **AFFIRM** Sake's sentence of 120 months' imprisonment.